United States District Court
Southern District of Texas
**ENTERED**
May 15, 2019
David J. Bradley, Clerk

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| MITCHELL YOUNGBLOOD, | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Civil Action No. 4:18-CV-0112 |
| | § | |
| NOBLE DRILLING (U.S.) LLC, | § | |
| *Defendant*. | § | |

## <u>MEMORANDUM AND RECOMMENDATION</u>

This employment discrimination case is before the court on Defendant Noble Drilling (U.S.) LLC's Motion for Summary Judgment on all of Mitchell Youngblood's claims. Dkt. 26. Having considered the parties' submissions, argument of counsel at a hearing on the record on April 12, 2017, and the law, the court recommends that Noble's motion be granted in part and denied in part, as set forth below.

## I.   <u>BACKGROUND</u>

Youngblood began working for defendant Noble in 2005 as a roustabout on the *Noble Therald Martin*.[1] He worked over the next several years as a floorhand, assistant crane operator, crane operator, Assistant Dynamic Positioning Officer (ADPO), Dynamic Positioning Officer (DPO), and Third Mate on various Noble drilling rigs around the world.[2]

---

[1] Italicized proper names refer to drilling rigs owned by Defendant Noble.

[2] Youngblood had an interruption in employment in 2011 due to a broken leg, Dkt. 27-2 at 32-33, but that incident is not relevant to this lawsuit.

On December 17, 2016, Youngblood was working as a DPO on the *Noble Danny Adkins*. Youngblood and the rig Captain, Curtis Laskowski, were aware that a weather event called a "frontal passage" was expected to arrive sometime during the night of December 17 or early morning of December 18. Before his shift ended at midnight, Youngblood received a weather service notification that the front would arrive between 1:00 and 2:00 a.m. on December 18. Youngblood did not notify Laskowski, who was off duty, of the updated and more specific window of time for the frontal passage. When Youngblood's relief, DPO Graham Philpot, arrived for his shift, Youngblood informed Philpot of the weather service notification. After leaving to check on another issue, Youngblood returned to Philpot, logged the current weather conditions, asked Philpot if there was anything else he needed, and retired for the night. Dkt. 27-2 at 42-45; Dkt. 31-19 at 2-4.

At approximately 12:25 a.m., Philpot attempted to start the rig's thrusters to maneuver away from the mooring buoy, but one thruster would not start. At approximately 1:00 a.m., Philpot alerted Captain Laskowski, who was still not on duty at the time, of the situation. Between 1:24 a.m. and 1:30 a.m., surge from the weather event caused the rig to run over a mooring buoy, causing approximately $589,000 in damage. Dkt. 27-3.

Captain Laskwoski, Philpot, and Youngblood were all disciplined for the December 18, 2016 buoy incident. Dkt. 27-3. After the incident, Junior Drilling Superintendent David Milne held a conference call with Laskowski, Youngblood, Philpot, and the rig manager to discuss the event. Youngblood and Philpot's relief notes say that Milne informed them during the call that "no fingers would be pointed, and not blame was to be placed," but that

2

they were written up anyway. Dkt. 31-6 at 2. For his part, Youngblood received a December 28, 2016 write up that criticized him for failing "to communicate with the Captain during inclement weather conditions," failing to "[b]e proactive when starting thrusters to help keep the rig clear of the buoy as the wind veers during frontal passage," and not "leaving your relief enough time to start thrusters and maneuver the rig prior to an estimated frontal passage occurring at 0100, 1 hour after watch turnover." Dkt. 31-7 at 2. The December 28, 2016 write up did not set forth any sanction, but stated the expectation that Youngblood's "future actions, reactions and decision-making to safe guard the rig and personnel onboard will be thought out, effective, proactive and controlled," and that when in doubt, he is "implored to notify the Captain immediately." *Id.*

Youngblood contends that his career was on an upward trajectory until the December 28, 2016 write-up, and that the write-up was discriminatory. He alleges that after the December 28, 2016 write up, he suffered a series of adverse employment actions, including being laid off on February 1, 2017 (along with Philpot) from his DPO position on the *Danny Adkins*, and the failure to be promoted to an ADPO or DPO position when he was rehired after the layoff. Unlike Youngblood, Philpot was not rehired after his February 1, 2017 layoff. Dkt. 27-4 at 2.

Youngblood complained to Noble representatives on May 17, 2017, and on other occasions over the next several days, that Noble had discriminated against him due to his race. Youngblood's employment with Noble ended on August 11, 2017 after Youngblood objected to signing a July 18, 2017 employee disciplinary form.

3

Youngblood filed this suit on January 16, 2018, alleging claims against Noble under Title VII and 42 U.S.C. § 1981 for race discrimination, retaliation, and hostile work environment. This Memorandum and Recommendation addresses only the discrimination and retaliation claims because Youngblood abandoned his hostile work environment claim by failing to address it in his response to Noble's Motion for Summary Judgment. *See Collins v. Noble Drilling (U.S.) LLC*, Civil Action No. H-16-2293, 2018 WL 7050254 at *2 (S.D. Tex. Dec. 19, 2018) (*adopted* 2019 WL 220306, Jan. 15, 2019) (plaintiff abandoned his § 1981 race discrimination claim by ignoring it in his summary judgment response). Youngblood's counsel confirmed at the hearing that Youngblood intended to abandon the hostile work environment claim.

Youngblood challenges nine discreet employment actions by Noble:[3]

1. **December 28, 2016** disciplinary form related to the December 18, 2016 incident that caused extensive damage to one of the buoys on the *Noble Danny Adkins*;

2. **February 1, 2017** lay off from the position of DPO on the *Noble Danny Adkins*;

3. **February 2017** rehire as a temporary Third Mate, instead of as DPO, on the *Noble Don Taylor*;

4. **April 2017** failure to promote to DPO on the *Noble Don Taylor*;

---

[3] Youngblood alleged, and Noble has moved for summary judgment on, two other adverse employment actions which Youngblood has abandoned by failing to respond to the summary judgment evidence: (1) the alleged failure to promptly inform Youngblood of the results of its investigation into his May 26, 2017 hotline call, and (2) the May 2017 promotion of Taylor McGovern instead of Youngblood to ADPO on the *Noble Globetrotter I*. *See Criner v. Tex.-N.M. Power Co.*, 470 F. App'x 364, 367-68 (5th Cir. 2012) ("Because Criner did not make a disparate treatment argument before the district court, it is waived as it relates to the Customer Service position. 'If a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived and cannot be considered or raised on appeal.'" (citation omitted)). In addition to the fact that he abandoned this particular failure to promote claim, the claim also fails for the reasons discussed in Section III.A.2 below—Youngblood's failure to present summary judgment evidence demonstrating he was better qualified than the person that was promoted or hired.

5. **February 2017 – August 2017** Harsh treatment by Chief Mates Gus Arriens and Ray Thibodeaux on the *Noble Don Taylor*;

6. **May 19, 2017** verbal reprimand by Captain Tom McDorr on the *Noble Don Taylor*;

7. **May 26, 2017** failure to promote to a DPO position on the *Noble Globetrotter II*;

8. **July 18, 2017** employee disciplinary form regarding his performance on the *Noble Don Taylor*; and

9. **August 11, 2017** termination from temporary Third Mate position on the *Noble Don Taylor*.

The court recommends that Noble's Motion for Summary Judgment be granted in full as to Youngblood's discrimination claim and denied with respect his retaliation claim based on actions 8 and 9 of the above list.

## II.   LEGAL STANDARDS

### A.  Summary Judgment Standards

Summary judgment is appropriate if no genuine issues of material fact exist, and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c). The party moving for summary judgment has the initial burden to prove there are no genuine issues of material fact for trial. *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001). Dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the nonmoving party. *Hyatt v. Thomas*, 843 F.3d 172, 177 (5th Cir. 2016). "An issue is material if its resolution could affect the outcome of the action." *Terrebonne Parish Sch. Bd. v. Columbia Gulf Transmission Co.*, 290 F.3d 303, 310 (5th Cir. 2002). The court construes the evidence in the light most favorable to the nonmoving

party and draws all reasonable inferences in that party's favor. *R.L. Inv. Prop., LLC v. Hamm*, 715 F.3d 145, 149 (5th Cir. 2013).

### B. *McDonnell Douglas* Burden-Shifting

Youngblood's Title VII and 42 U.S.C. § 1981[4] claims are subject to the familiar *McDonnell Douglas* burden-shifting framework.[5] *Davis v. Dall. Area Rapid Transit*, 383 F.3d 309, 316–17 (5th Cir. 2004). Pursuant to this framework, a plaintiff relying on circumstantial evidence must first present evidence of each element of a prima facie case of discrimination or retaliation. *Id.* at 317 (citing *Patel v. Midland Mem'l Hosp. & Med. Ctr.*, 298 F.3d 333, 342 (5th Cir. 2002)). If a plaintiff meets this prima facie burden, a presumption of discrimination or retaliation arises, shifting the burden of production to the employer to articulate a legitimate, nondiscriminatory reason for its employment action. *Id.*; *Hernandez v. Metro. Transit Auth. of Harris Cty.*, 673 F. App'x 414, 417 (5th Cir. 2016). If the employer states a legitimate reason for its action, the inference of discrimination disappears, and the burden shifts back to the plaintiff to present evidence that the employer's proffered reason is merely pretextual. *Id.* "In contrast to the minimal burden that a plaintiff bears when establishing his prima facie case, a plaintiff must produce 'substantial evidence of pretext.' *Hernandez*, 673 F. App'x at 419 (quoting *Auguster v. Vermilion Par. Sch. Bd.*, 249 F.3d 400, 402–03 (5th Cir. 2001)). The plaintiff always bears

---

[4] "The elements of the claims under Title VII and 42 U.S.C § 1981 are identical. *Casarez v. Burlington Northern/Santa Fe Co.*, 193 F.3d 334, 337 n.3 (5th Cir.1999). [The court] therefore evaluate[s] both claims using the same analysis." *Pratt v. City of Houston, Tex.*, 247 F.3d 601, 606 (5th Cir. 2001).

[5] Counsel for both sides confirmed at the hearing on the record that the *McDonnell-Douglas* framework applies to all claims in this case.

6

the ultimate burden to prove discrimination. *Outley v. Luke & Assoc., Inc.*, 840 F.3d 212, 216 (5th Cir. 2016).

### III.   ANALYSIS

#### A. Race Discrimination

To establish a prima facie case of discrimination, Youngblood must show: (1) he was in a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was replaced by someone outside of his protected class, the employer promoted someone who is outside of his protected class, or he was otherwise treated less favorably than similarly situated employees. *Okoye v. Univ. of Tex. Hous. Health Sci. Ctr.*, 245 F.3d 507, 512–13 (5th Cir. 2001); *Outley v. Luke & Assoc., Inc.*, 840 F.3d 212, 216 (5th Cir. 2016); *Autry v. Fort Bend Indep. Sch. Dist.*, 704 F.3d 344, 347 (5th Cir. 2013); *Bryan v. McKinsey & Co.*, 375 F.3d 358, 360 (5th Cir. 2004); *Frank v. Xerox Corp,* 347 F.3d 130, 137 (5th Cir. 2003); *Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002).

For purposes of summary judgment, Noble does not contest the first two elements of Youngblood's prima facie case. However, Noble contends that several of the nine employment actions identified above do not rise to the level of an adverse employment action for purposes of a discrimination claim. As to the remaining actions, Noble has put forth legitimate, non-discriminatory explanations for its decisions, and contends that Youngblood cannot show that its legitimate explanations are merely pretext for race discrimination.

7

### A.1. Youngblood Has Not Met His Prima Facie Burden on Four Alleged Adverse Employment Actions

Only "ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating," constitute adverse employment decisions for purposes of proving a prima facie case of discrimination. *Felton v. Polles,* 315 F.3d 470, 486 (5th Cir. 2002), *overruled on other grounds by Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). Title VII does not address "every decision made by employers that arguably might have some tangential effect upon…ultimate [employment] decisions." *Banks v. East Baton Rouge Parish Sch. Bd.*, 320 F.3d 570, 575 (5th Cir. 2003) (employer's decision that limits an employee's opportunities for promotion or lateral transfer does not qualify as an adverse employment action); *see also, Ackel v. Nat'l Comm., Inc.*, 339 F.3d 376, 385 (5th Cir. 2003) ("restructuring office procedures, clarifying job duties, and…reprimands[] do not constitute ultimate employment decisions," (quoting *Green v. Administrators of the Tulane Educ. Fund*, 284 F.3d 642, 657-58 (5th Cir. 2002)); *Odeh v. City of Baton Rouge/Par. of E. Baton Rouge*, 731 F. App'x 288, 292 (5th Cir. 2018) (written reprimand and warning that future incidents would result in more severe action did not constitute an ultimate employment decision).

Actions 1, 5, 6 and 8—the December 28, 2016 employee disciplinary form, the harsh treatment by Chief Mates Arriens and Thibodeaux on the *Don Taylor*, the May 19 verbal reprimand, and the July 18, 2017 employee disciplinary form—do not directly impact the terms of Youngblood's employment such as hiring, granting leave, discharging, promoting, and compensating, and do not constitute adverse employment actions.

Therefore, Youngblood cannot meet his burden to present a prima facie case of discrimination as to these four employment decisions (actions 1, 5, 6, and 8). Youngblood cites *Brooks v. Houston Indep. Sch. Dist.*, 86 F. Supp. 3d 577, 586 (S.D. Tex. 2015), for the proposition that "[d]isciplinary write-ups that are the basis for more serious consequences may be adverse employment actions." Dkt. 30 at 22. *Brooks*, however, is a retaliation case, which involves a less rigorous standard for an adverse employment action, as discussed in more detail below in Section III.B.1.b.

Noble does not dispute that termination constitutes an adverse employment action, but strenuously disputes that Youngblood was terminated. According to Noble, Youngblood resigned. Captain Malone called Youngblood into his office on August 11, 2017, intending to offer him a permanent Third Mate position on the *Noble Don Taylor*. However, he told Youngblood that before he could accept the position, Youngblood needed to sign a July 18, 2017 employee disciplinary form regarding performance issues brought to Malone's attention by Chief Mates Arriens and Thibodeaux. As Youngblood explained in his deposition:

> [Malone] . . . said: "As you are aware, there is a third mate position. Before I can offer this position to you, we have to take care of this matter." And he gave me the write-up. So he never offered [the job] because he said we had [to] take care of the write-up and I didn't sign the write-up and I got up and walked out of the office.

Dkt. 27-2 at 34-35. Youngblood further testified that he told Malone, "No, I'm not signing the write-up." Dkt. 27-2 at 83. According to Youngblood, he returned to Malone's office and asked Malone to call Noble HR representative Amanda Joiner, but Malone replied that Joiner had already directed Malone to "tell Mitchell his resignation is effective

immediately." *Id.* at 86. Youngblood denies he intended to resign but admits he never told Malone or anyone in management that he wanted to continue working. *Id.* at 87-89.

Malone wrote an email to Joiner that same day, stating that Youngblood refused to sign the letter of warning and that "[Youngblood] initially accepted the position of Third Mate on board the Taylor, but has since changed his mind and he was told that means he is resigning from the Company effective immediately." Dkt. 27-7 at 21. The email also said, "He will be on this afternoon's flight, should be departing in about three hours." *Id.* Malone testified at his deposition that "[Youngblood] declined the job because he didn't want the Letter of Warning[,]" and "I don't think he said the words 'I resign' or 'I quit.' But . . . I thought I made it very clear to him that he would be resigning from the company, that there was no position for him." Dkt. 27-7 at 14.

Youngblood's and Malone's accounts of the August 11, 2017 encounter differ: Malone has testified that he believed Youngblood was resigning when he left the rig on the next helicopter, while Youngblood's affidavit states that he left on the next helicopter at Malone's direction. Noble argues that Youngblood previously made a sworn statement in his EEOC complaint that he "quit," and cannot manufacture a fact issue by attesting to an affidavit that contradicts his prior sworn statement. *See Suncoast Post-Tension, Ltd. v. Scoppa*, Civil Action No. 4:13-cv-3125, 2015 WL 12762260 at *3 (S.D. Tex. Sept. 2, 2015) (explaining "sham affidavit" rule).

This is not a case in which Youngblood has sworn out a "sham affidavit" that clearly contradicts a prior sworn statement. Youngblood's affidavit states that he wrote on his EEOC complaint "I never submitted a resignation letter and said I quit." (Dkt. 31-1 at 6).

In the EEOC complaint, Youngblood wrote: "After refusing to accepted [sic] the write up which clearly shows discrimination, I was told resignation effective immediate [sic]. I never sent a resignation letter. I stated I quit." Dkt. 27-9 at 9. The words "I stated I quit," in the EOC complaint follow the sentence "I was told resignation effective immediate [sic]." Furthermore, Malone testified that he did not think Youngblood said "I resign" or "I quit." Dkt. 27-7 at 14. The record reflects the existence of a material fact issue as to whether Youngblood was terminated or voluntarily resigned and therefore, for purposes of summary judgment, Youngblood's termination claim satisfies the adverse employment action element of a discrimination claim.[6]

In summary, Youngblood cannot state a prima facie case of discrimination as to four of his challenged employment actions:

1. the December 28, 2016 employee disciplinary form (involving the buoy incident on the *Noble Danny Adkins*);
5. the harsh treatment by Chief Mates Arriens and Thibodeaux on the *Don Taylor*;
6. the May 19 verbal reprimand; and
8. the July 18, 2017 employee disciplinary form.

As to the remaining five employment actions challenged by Youngblood —his February 1, 2017 lay off; his February 2017 demotion to a temporary Third Mate position; the April 2017 failure to promote him to a DPO position on the *Don Taylor;* the May 26, 2017 failure to promote him to DPO on the *Noble Globetrotter II;* and his termination (actions 2, 3, 4, 7, and 9)— the court must next consider whether Youngblood has met his summary

---

[6] The court's references to Youngblood's "termination" throughout this memorandum and recommendation are for the sake of simplicity and should not be construed as a ruling on the issue as a matter of law.

judgment burden to show that Noble's offered legitimate, non-discriminatory basis for each of these adverse employment actions is pretext for discrimination.

### A.2    Youngblood Has Not Met His Burden to Show Pretext as to the Five Adverse Employment Actions that Survived Prima Facie Review

#### A.2.a  The February 1, 2017 lay off.

Noble's evidence that it laid off Youngblood in February 2017 due to an economic downturn in the oil and gas industry (during which Noble laid off over 1,000 employees, including Philpot, the other DPO on the *Danny Adkins*) is extensive and uncontroverted. Decl. of Priscilla Heistad, Dkt. 27-1; Decl. of Amanda Joiner, Dkt. 27-4; Decl. of John Hawkins, Dkt. 27-5. According to Noble, the downturn reduced the need for rigs which caused Noble to "stack" rigs or take them fully or partially out of operation. In order to retain as many employees as possible during this period, Noble transferred hundreds of employees to different rigs and/or into lower positions than they held previously. *Id.* In early 2017, Noble was preparing to "stack" the *Danny Adkins* because it was no longer under contract. Decl. of David Milne, Dkt. 27-3. Youngblood acknowledges that there were no jobs available on the *Noble Danny Adkins* in 2017 because it was being stacked and that Noble laid off or transferred many employees during this time frame due to the economic downturn. Dkt. 27-2 at 32-34, 65.

However, Youngblood points to two examples of alleged discriminatory intent that he contends are evidence that Noble's explanation for his layoff is pretext:  (i) evidence of discrimination or prejudice by Captain Laskowski, who authored the December 28, 2016 write-up for the buoy incident, and (ii) the fact that two other DPOs, who are Caucasian

and also were not on duty when the *Danny Adkins* ran over its buoy, were not disciplined or laid off.

> ### A.2.a.i  Youngblood has failed to present sufficient evidence of discrimination to raise a fact issue on whether Noble's proffered non-discriminatory basis for the February 1, 2017 layoff is pretext.

Youngblood asserts that he should not have been written-up because, unlike Philpot, he was off duty at the time the rig ran over the buoy, and Laskowski's standing orders did not require him to notify the Captain of an updated weather report. Dkt. 31-19 at 4. He claims his discipline was the result of race-based discrimination. The sole basis for his claim of racial discrimination is that approximately five or six months earlier, in June or July of 2016, he overheard Captain Laskowski say "you can't trust black people who don't drink." Youngblood testified that he had "no idea [the context of the statement]. I overheard him talking to someone," and remembers nothing else about the statement. Dkt. 27-2 at 39-40. Youngblood has offered no evidence, other than his own speculation, that Laskowski knew Youngblood does not drink alcohol.

Laskowski's remark is nothing more than a "stray remark" that is insufficient to show that Noble's legitimate explanation for the February 1, 2017 lay off is pretext for discrimination. *See Patel v. Midland Mem. Hosp. and Med. Ctr.*, 298 F.3d 333, 343 (5th Cir. 2002) (stray remarks failed to create a fact issue regarding the reason for plaintiff's suspension). An oral statement that displays racial animus may be probative of discrimination if made by a person responsible for the adverse employment action or by a person with influence over the decision-maker. *See Laxton v. Gap Inc.*, 333 F.3d 572, 583 (5th Cir. 2003) (manager's angry response to plaintiff's pregnancy notification, combined

with other evidence that employer's stated reasons for her termination were not credible, was evidence of pretext); *Berquist v. Wash. Mut. Bank*, 500 F.3d 344, 351-52 (5th Cir. 2007) ("Statements evince unlawful discrimination only if the comments 'first, demonstrate discriminatory animus and, second, [are] made by a person primarily responsible for the adverse employment action or by a person with influence or leverage over the formal decisionmaker.'") (quoting *Laxton*). However, "such remarks cannot suffice as the sole evidence of pretext." *Beltran v. Univ. of Tex. Health Sci. Ctr. at Houston*, 837 F. Supp. 2d 635, 645 (S.D. Tex. 2011) (citing *Phillips v. TXU Corp.*, 194 F. App'x 221, 228 (5th Cir. 2006)). Youngblood has failed to offer any evidence that Laskowski influenced or made the decision to lay him off, or that the December 28, 2016 write-up itself influenced the decision to lay him off.

Laskowski's remark, overheard by Youngblood five or six months prior to the date of the December 28, 2016 written discipline, does not demonstrate that Noble's explanations for the write-up and the February 1, 2017 layoff are pretextual. *See Wyvill v. United Companies Life Ins. Co.*, 212 F.3d 296, 304 (5th Cir. 2000) (remarks that were "neither direct and unambiguous" nor "tied to a time frame relevant to this case" were not probative on the ultimate question of discrimination). Moreover, although Laskowski authored the written discipline, he told Youngblood that he was directed to do so "from above," and that the Superintendent had to verify it. Dkt. 27-2 at 50. Milne, Laskowski's superior, testified that he discussed disciplining Youngblood with Laskowski, and that Noble decided to discipline Youngblood "because of his failure to allow his relief (Philpot) or Captain Laskowski sufficient time to prepare for the weather event." Dkt. 27-3. Captain

14

Laskowski's initial draft of the discipline report acknowledged that Youngblood had been off duty for two hours and was asleep at the time the rig ran over the mooring buoy, but Milne deleted that language from the final version because he considered it "extraneous information." Dkt. 31-19 at 4; Dkt. 27-3 at 3. Youngblood has never heard Milne make a racially discriminatory comment, Dkt. 27-2 at 62, and there is no evidence that Milne's decision to discipline Youngblood was motivated by Youngblood's race.[7]

### A.2.a.ii Youngblood cannot show he was treated differently than similarly situated employees with respect to either the December 28, 2016 write-up or the February 1, 2017 layoff.

Youngblood argues that he was treated differently than the employees most similarly-situated to him, Brook Michael Adams and Michael Tyler Gavis, who were not disciplined for the buoy incident or laid off on February 1, 2017. Youngblood contends that like Adams and Gavis, he was "completely blameless" for the buoy incident. Dkt. 30 at 26. However, Youngblood cannot show that Adams and Gavis are similarly situated employees for purposes of showing disparate treatment. *See Okoye*, 245 F.3d at 514 (to establish disparate treatment a plaintiff must show that the employer gave preferential treatment to another employee under "nearly identical circumstances."). Despite his vigorous claims of total innocence, there is no dispute that Youngblood was the DPO on duty when the last National Weather Service Report predicting the time of the frontal

---

[7] Under the "cat's paw" theory of liability, a plaintiff attempts to prove discrimination by showing that a person with racial animus influenced the decisionmaker. *Wu v. Miss. State Univ.*, 626 F. App'x 535, 538 (5th Cir. 2015). To the extent Youngblood relies on the cat's paw theory to show any alleged adverse employment actions were discriminatory because they were influenced by the December 28, 2016 write-up, the cat's paw theory fails due to the absence of evidence from which a jury could conclude that the December 28, 2016 write-up itself was racially motivated.

passage came in; he did not alert Laskowski to the report; and he did not take proactive steps to start the thrusters in advance of the weather event before his shift ended.

In contrast, Youngblood has presented no evidence to show that Adams and Gavis were even on the rig at the time, and it appears from the record that they were not.[8] In addition, Adams held a different position on the *Danny Adkins*—he was an ADPO, while Youngblood was a DPO. Furthermore, Noble laid Adams off in March 2017, the month following Youngblood's layoff. Gavis, who had been demoted from Chief Mate to DPO on the *Danny Adkins* in August 2016, resigned from Noble effective January 31, 2017, eliminating the need for Noble to lay him off with other *Danny Adkins* crew members. Dkt. 35-1.

In sum, Youngblood disagrees with Noble's decision that he shares responsibility for the December 18, 2016 buoy incident.  But the fact that Youngblood disagrees with the December 28, 2016 write-up does not constitute evidence that the discipline was motivated by discrimination.  Courts do not second-guess an employer's personnel or business decisions. *Deines v. Texas Dept. of Protective and Reg. Serv.*, 164 F.3d 277, 281 (5th Cir. 1999) ("Whether the employer's decision was the correct one, or the fair one, or the best one is not a question within the jury's province to decide. The single issue for the trier of fact is whether the employer's [action] was motivated by discrimination."); *McVille v. Inter-Cmty. Healthcare, Inc.*, 460 F. App'x 353, 355 (5th Cir. 2012) ("[T]he relevant issue

---

[8] Employees on the *Danny Adkins* work 21-day "hitches." During a hitch, each DPO worked 12-hours on and 12-hours off, so two DPOs could supply continuous 24-hour coverage for 21 days. Dkt. 27-2 at 21, 37, 58-59. Philpot and Youngblood worked the two 12-hour shifts on December 17-18, 2016. *Id.* At the end of their 21-day hitch, they left "relief notes" for the next hitch, "Brook and Tyler." Dkt. 31-6. Therefore, the record indicates that Brook and Tyler were not on the rig at the time of the December 18, 2016 buoy incident.

in a Title VII case is whether an employer discriminated against its employee, not whether it made a correct disciplinary determination.").

Because Youngblood has failed to demonstrate a genuine issue of fact as to whether Noble's explanation for laying him off is pretext for discrimination, Noble is entitled to summary judgment on the claim.

### A.2.b The February 2017 rehire as a temporary Third Mate, instead of as temporary DPO, on the Noble Don Taylor

Youngblood missed no work as a result of his lay off because he was rehired almost immediately as a temporary Third Mate on the *Don Taylor*. Nonetheless, Youngblood argues that Noble should have rehired him in the position of temporary ADPO, instead of promoting a Third Mate on the *Don Taylor*, a Caucasian named Patrick Puvogel, to that position. The declaration of John Hawkins, a Noble Drilling Superintendent, states that in February 2017 a temporary ADPO position on the *Don Taylor* became available when an ADPO went on a leave of absence. Dkt. 27-4 at 2; Dkt. 27-5. Hawkins and the Captains on the *Don Taylor* elevated Puvogel to fill the temporary ADPO position because Puvogel had worked on the *Don Taylor* for several years, including filling in as an ADPO, was familiar with the rig, and had a strong performance history. Dkt. 27-5. In response, Youngblood argues that he was better qualified than Puvogel for the ADPO position because he had acted as DPO on the *Don Taylor* for one week in 2016 and had 5 years of experience as a DPO. Dkt. 27-2 at 31; Dkt. 31-1 at 193-94.

A Plaintiff in a failure to promote case may show pretext by demonstrating he was "clearly better qualified (as opposed to merely better or as qualified) than the chosen

employee," or "by showing that the employer's proffered explanation is false or unworthy of credence." *Roberson-King v. Louisiana Workforce Comm'n*, 904 F.3d 377, 381 (5th Cir. 2018). Employers are free to weigh the qualifications of candidates and use their own judgment in making choices, as long as their choices are not motivated by race. *Id.* at 382.

Youngblood has offered no evidence of Puvogel's qualifications or lack of qualifications for the job, or shown that he was clearly better qualified than Puvogel. In addition, rig management on the *Don Taylor* made the decision to promote Puvogel, a *Don Taylor* crew member, to the ADPO position, thereby creating the Third Mate opening on that rig. Youngblood fails to present any evidence that the decision to promote Puvogel rather than Youngblood was influenced by the December 28, 2016 write-up of Youngblood for the buoy incident on the *Danny Adkins*. Because Youngblood failed to meet his burden to show that Noble's stated reasons for promoting Puvogel are pretext for discrimination, Noble's motion for summary judgment on this claim should be granted.

### A.2.c The April 2017 failure to promote to DPO on the Noble Don Taylor

In April 2017, Noble transferred Tim Griffin, a Caucasian who was previously DPO on the *Noble Bully I*, to fill the position of DPO on the *Noble Don Taylor*. Dkt. 27-5. The *Bully I* was being "cold stacked" due to lack of work and, because the bridge crew was a strong one, Noble wanted to retain as employees as many members of the *Bully I* crew as possible. *Id.*; Dkt. 27-1 at 2-3. Griffin had been a DPO for five years and had strong performance reviews. *Id.* Noble considered Youngblood for this position, but Captain McDorr on the *Don Taylor,* who had worked with and been pleased with Youngblood's

performance on the *Danny Adkins* prior to the buoy incident, did not believe Youngblood's recent performance on the *Don Taylor* was strong enough to warrant a promotion to DPO. Dkt. 27-4 at 3; Dkt. 27-6.

Youngblood has presented no evidence to show that he was clearly better qualified for the *Don Taylor* DPO position than Griffin. Nor has Youngblood presented evidence showing that Noble's stated reason for placing Griffin in the DPO position is pretext for race-based discrimination against Youngblood. Thus, Noble's motion for summary judgment on this claim should be granted.

### A.2.d The May 26, 2017 failure to promote to ADPO on the *Globetrotter II.*

In May 2017, Noble considered Youngblood and Jeremy Biven for the position of ADPO on the *Noble Globetrotter II*, but selected Joao Lima for the position. Dkt. 27-1 at 3; Dkt. 27-4 at 3. Noble selected Lima over other candidates because he had previously served on the *Globetrotter II* for eighteen months as ADPO and for three months as DPO. *Id.* Despite initially considering or offering the position to Biven, Noble did not promote Biven because he did not have the proper certification and therefore was not qualified. Dkt. 27-4 at 3.

Youngblood argues that he should have been hired for the position over Lima. However, he has presented no evidence Lima's qualifications and cannot show that he was better qualified than Lima for the ADPO position on the *Globetrotter II.* Youngblood fails to point to any evidence that Noble's explanation for placing Lima in the position is pretext

for discrimination based on race. Thus, Noble's motion for summary judgment on this claim should be granted.

### A.2.e The August 11, 2017 termination from temporary Third Mate position on the Noble Don Taylor

As discussed above, Laskowski's single stray remark does not demonstrate that the December 28, 2016 write-up was discriminatory. Likewise, Captain Malone's knowledge, if any, of the December 28, 2016 write-up does not demonstrate that Youngblood's termination was discriminatory.[9] The July 18, 2017 employee disciplinary form that Youngblood refused to sign and which was central to the incident in which Youngblood was either fired or resigned, was based on information provided to Malone by Arriens and Thibodeaux. Dkt. 27-8; Dkt. 27-7. Nothing in the record indicates that Arriens or Thibodeaux were influenced by the December 28, 2016 write-up or harbored any racial animus towards Youngblood. The record contains no evidence that Noble treated similarly situated non-African-American employees differently than Youngblood. The record shows that Amanda Joiner was involved in the decision to terminate Youngblood, even if she was not the sole decision-maker.[10] But Youngblood has also failed to present any evidence of race-based discrimination by Joiner. In sum, Youngblood has failed to present any

---

[9] Contrary to Youngblood's arguments, the "cat's paw" theory does not save Youngblood's discrimination claim. *Laxton*, 333 F.3d at 584 ("[T]he discriminatory animus of a manager can be imputed to the ultimate decision-maker if the decisionmaker acted as a 'rubber stamp,' or the 'cat's paw' for the subordinate employee's prejudice. The relevant inquiry is whether the [supervisor] had influence or leverage over [the employer's] decisionmaking."). As noted *supra*, at n.7, because there is no evidence that the December 28, 2016 write up was discriminatory, and no evidence it influenced any subsequent decisions, the cat's paw theory fails.

[10] Youngblood testified that when he asked Malone to call Joiner, Malone said "Amanda Joinder already know[s]. She's the one that told me to do this" and "Amanda Joiner says [your] resignation [is] effective immediately." Dkt. 27-2 at 84-85.

evidence on which a reasonable jury could base a finding that Noble's explanation for terminating Youngblood is pretext for racial discrimination.

### B. Retaliation

#### B.1 Youngblood has established a prima facie case of discrimination with respect to certain alleged adverse actions

To establish a prima facie case of retaliation, the plaintiff must show that: (1) he engaged in protected activity; (2) he was subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action. *Davis*, 383 F.3d at 319 (5th Cir. 2004).

##### B.1.a   First prima facie element:  protected activity

No dispute exists that Youngblood engaged in protected activity on May 17, 2017 when he complained to Joiner in an email that the December 2016 written discipline and Noble's subsequent failure to promote him to ADPO or DPO were discriminatory actions. He also complained verbally to Captain McDorr on May 19, 2017 and to Captain Malone on May 26, 2017. In addition, he called the Noble employee hotline on May 26, 2017 to complain about discrimination and retaliation. Without doubt, Youngblood has satisfied the first element of his prima facie retaliation case.

##### B.1.b   Second prima facie element: adverse employment action

Courts employ a broader definition of "adverse employment action" in the retaliation context than in the discrimination context. *See Porter v. Houma Terrebonne Hous. Auth. Bd. of Comm'rs*, 810 F.3d 940, 945–46 (5th Cir. 2015) (recognizing that adverse employment actions for retaliation claims are not limited to the workplace, and the

standard is less demanding than an ultimate employment decision). An adverse employment action in the retaliation context is one that is "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* at 945 (alteration in original) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). The employment action is judged by a "reasonable employee" standard, i.e., whether alleged conduct would dissuade "a reasonable employee" from protected activity, and therefore the determination of whether an action constitutes an adverse employment action in the retaliation context often depends upon the particular circumstances of each case. *Id.* at 945–46.

Termination and denial of promotion are adverse employment actions for purposes of a plaintiff's prima facie case. The court has already found whether Youngblood was terminated on August 11, 2017 to be a disputed issue of material fact. Therefore, to the extent his retaliation claim is based on the alleged termination or on his lack of promotion on May 26, 2017, Youngblood satisfies the second element of his prima facie case. Whether the remaining post-May 17, 2017 alleged actions[11]—the harsh treatment from Arriens and Thibodeaux on the *Don Taylor* from February 2017 through August 2017; the May 19, 2017 verbal reprimand by Tom McDorr; and the July 18, 2017 employee

---

[11] As further discussed below in section B.1.c regarding causation, many of Youngblood's alleged adverse employment actions pre-date his protected activity and therefore cannot be causally linked to the protected activity. As a matter of law, only adverse employment actions occurring after the date Youngblood first engaged in protected activity can constitute retaliatory conduct prohibited by Title VII. *See Allen v. Envirogreen Landscape Professionals, Inc.*, 721 F. App'x 322, 326 (5th Cir. 2017) (alleged workplace retaliation that pre-dated submission of complaint cannot support retaliation claim).

discipline form presented by Malone on August 11, 2017 (actions 5, 6, and 8 on the list in

Section I)—constitute adverse employment actions is analyzed below.

### B.1.b.i The May 19, 2017 verbal reprimand by Captain McDorr

McDorr alleges that he verbally reprimanded Youngblood on May 19, 2017,

because Youngblood interrupted him during a conference call with shoreside management

to complain about his discipline on the *Danny Adkins* and the uncertainty of his temporary

employment status. Dkt. 27-6 at 2. The record of verbal consultation prepared by McDorr

states:

> On the 19th of May, 2017, at 1120 following a series of letters, conference
> requests with Rig Management; to review past Disciplinary actions from
> December 2016 and to re-evaluate his Temporary employment status, Mr.
> Mitchell Youngblood 3rd Mate, was given consultation to refocus on his
> immediate assigned duties and not to focus on re-assignment to another Rig.
> He was cautioned that today's actions were not professionally rendered nor
> was Rig Management in a position to re-assign him to another Noble facility.
> He was instead encouraged to apply himself to and strengthen his own
> abilities.

Dkt. 27-6 at 3. Youngblood denies that McDorr gave him a verbal reprimand on May 19,

2017. Dkt. 27-2 at 78-79.

Youngblood undisputedly engaged in protected activity when he approached

McDorr on May 19, 2017 to complain about discrimination. However, the verbal

reprimand, standing alone, does not constitute an adverse employment action under Fifth

Circuit precedent. *See Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d 473, 485 (5th Cir.

2008) ("As a matter of law, these allegations [of poor treatment by managers] do not rise

to the level of material adversity. Instead they fall into the category of 'petty slights, minor

annoyances, and simple lack of good manners' that employees regularly encounter in the

workplace, and which the Supreme Court has recognized are not actionable retaliatory conduct." (citations omitted)); *King v. Louisiana*, 294 F. App'x 77, 85 (5th Cir. 2008) ("allegations of unpleasant work meetings, verbal reprimands, improper work requests, and unfair treatment do not constitute actionable adverse employment actions as discrimination or retaliation."). In addition, under the particular circumstances of this case, it is clear that McDorr's verbal reprimand did not dissuade Youngblood from making a future complaint of discrimination, because Youngblood called the Noble hotline to complain about discrimination one week later, on May 26, 2017.

### *B.1.b.ii The July 18, 2017 employee disciplinary form*

As noted above, written reprimands or warnings generally do not qualify as adverse employment actions even in the context of retaliation. However, the July 18, 2017 written discipline arguably led to, or is inexorably intertwined with, Youngblood's termination on August 11, 2017. Therefore, under the particular facts of this case, the July 18, 2017 written discipline differs from an ordinary disciplinary action and can be considered an adverse employment action for the purpose of establishing Youngblood's prima facie case. *See Brooks v. Houston Indep. Sch. Dist.*, 86 F. Supp. 3d 577, 586 (S.D. Tex. 2015) ("Disciplinary write-ups that are the basis for more serious consequences may be adverse

employment actions,") (citing *Hernandez v. Sikorsky Support Servs., Inc.*, 495 F. App'x

435, 438 (5th Cir. 2012)).

### B.1.b.iii The harsh treatment by Arriens and Thibodeaux

Youngblood alleges Chief Mates Arriens and Thibideaux retaliated against him for

engaging in protected activity by treating him harshly on the *Don Taylor* from February

2017 through August 2017. He contends that

> [w]ithin his first ten days on the *Noble Don Taylor* the chief mates Gus
> Arriens and Ray Thibodeaux began to treat [him] harshly and then
> continuously refused to or failed to train [him] on the job requirements of a
> third-mate on the rig. The chief mates were also upset after [he] discovered
> the lifeboat water bottles had expired, causing Noble to discipline the chief
> mates. One chief mate reprimanded [him] for not cleaning the windows of
> the lifeboats even though there was no Job Safety Analysis (JSA) requiring
> such a task. The chief mates refused to or did not train [him] on how to keep
> the lifeboat oxygen bottles primed, which was a dangerous task without
> proper training….[O]ne of the chief mates [asked] to meet while Youngblood
> was off duty and without pay in order to discuss an upcoming cement job
> [and Youngblood refused].

Dkt. 30 at 12-13.

To the extent the harsh treatment and failure to train began within ten days of his

arriving on the *Don Taylor* in February 2017, and before he first complained about

discrimination on May 17, 2017, even Youngblood concedes it cannot support a claim for

retaliation. Even if it occurred after his initial May 17, 2017 complaint, the alleged harsh

treatment Youngblood alleges, such as being asked to attend meetings when he was off the

clock and being reprimanded for failing to clean lifeboat windows, does not constitute an

adverse employment action for purposes of his Title VII retaliation claim. "[A]llegations

of unpleasant work meetings, verbal reprimands, improper work requests, and unfair

treatment do not constitute actionable adverse employment actions as discrimination or retaliation." *King v. Louisiana*, 294 F. App'x 77, 85 (5th Cir. 2008); *see also Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d 473, 485 (5th Cir. 2008) ("As a matter of law, these allegations [of poor treatment by managers] do not rise to the level of material adversity. Instead they fall into the category of 'petty slights, minor annoyances, and simple lack of good manners' that employees regularly encounter in the workplace, and which the Supreme Court has recognized are not actionable retaliatory conduct." (citations omitted)).

Youngblood also alleges that the lack of training by Arriens and Thibodeaux contributed to the July 18, 2017 employee discipline and his alleged August 11, 2017 termination. The court has found that the July 18, 2017 employee discipline and the alleged August 11, 2017 termination satisfy the prima facie element of adverse employment action, and therefore will include the allegations of lack of training when conducting the pretext analysis in section B.2.

### B.1.c   Third prima facie element: a causal link between protected activity and alleged adverse action

#### B.1.c.i Pre-May 17, 2017 actions

As previously stated, only adverse employment actions occurring after the date Youngblood first engaged in protected activity can be causally linked to protected activity. *See Allen v. Envirogreen Landscape Professionals, Inc.*, 721 F. App'x 322, 326 (5th Cir. 2017) (alleged workplace retaliation that pre-dated submission of complaint cannot support retaliation claim). Youngblood conceded at the oral hearing on Noble's motion for summary judgment that as a matter of law, none of Noble's conduct prior to May 17, 2017

is causally connected to his protected activity. Therefore, Noble is entitled to summary judgment on Youngblood's retaliation claim to the extent it is based on: the December 28, 2016 write-up regarding the buoy incident on the *Noble Danny Adkins*; the February 2017 lay off from the position of DPO on the *Noble Danny Adkins*; his February 2017 rehire as a Third Mate, instead of as DPO, on the *Noble Don Taylor*; and Noble's failure to promote him to DPO on the *Noble Don Taylor* in April 2017 (actions 1-4 on the list in Section I).

### B.1.c.ii May 26, 2017 failure to promote to DPO on the Globetrotter II

The parties dispute whether Youngblood's May 26, 2017 failure to promote claim is causally connected to his protected activity. Noble has presented summary judgment evidence demonstrating that Drilling Superintendents Perry Hammond and Thomas Saliba made the May 26, 2017 decision to promote Joao Lima to the position of ADPO on the *Noble Globetrotter II*. Dkt. 27-10; Dkt. 27-11. In their declarations, Hammond and Saliba deny they had any knowledge of Youngblood's complaints of discrimination at the time they selected Lima for the ADPO position on the *Noble Globetrotter II*. *Id.* Youngblood has failed to present any evidence regarding Hammond's or Saliba's knowledge of his complaints and therefore has failed to meet his prima facie burden to show a causal connection between his protected activity and Noble's failure to select him for the promotion.[12] *See Chaney v. New Orleans Pub. Facility Mgmt., Inc.*, 179 F.3d 164, 168 (5th Cir. 1999) ("If an employer is unaware of an employee's protected conduct at the time of the adverse employment action, the employer plainly could not have retaliated against the

---

[12] Even if Youngblood could make a prima facie showing, he could not meet his ultimate burden to show that but for retaliation, he would have gotten the promotion.

employee based on that conduct."). Therefore, Noble is entitled to summary judgment also on the May 26, 2017 failure to promote claim.

### B.2   Youngblood Has Met His Burden to Create a Fact Issue as to Pretext Regarding the Final Two Adverse Employment Actions

Youngblood has established a prima facie case of retaliation based on the July 18, 2017 employee discipline and the August 11, 2017 termination, and the failure to train by Arriens and Thibodeaux is alleged to have influenced or resulted in the July 18, 2017 written discipline and the August 11, 2017 termination.

In response, Noble has put forth legitimate, non-retaliatory reasons for the July 18, 2017 employee discipline and the August 11, 2017 termination. Noble contends the July 18 written discipline resulted from Youngblood's documented performance issues on the *Don Taylor,* and that it had a good faith belief that Youngblood resigned on August 11, 2017.  Noble's presentation of legitimate, non-retaliatory reasons for its actions, shifts the burden to Youngblood to create a fact issue as to whether Noble's proffered reasons for its actions are pretext. The failure to train, the July 18, 2017 written discipline and the August 11, 2017 termination are inexorably intertwined. Therefore, the court addresses the pretext issue as to these allegations jointly.

At the pretext stage of the analysis, a plaintiff must show that the adverse employment action would not have occurred "but for" his protected conduct. *Septimus v. Univ. of Houston*, 399 F.3d 601, 608 (5th Cir. 2005); *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 806 (5th Cir. 2007) ("The proper standard of proof ... [for] a Title VII retaliation claim is that the adverse employment action ... *would not have occurred 'but*

*for' [the] protected conduct*." (emphasis in original; quoting *Septimus*)); *Rodriguez v. Brownsville Indep. Sch. Dist.*, 739 F. App'x 227, 231 (5th Cir. 2018), as revised (Aug. 3, 2018) ("An employee establishes pretext by showing that the adverse action would not have occurred but for the employer's retaliatory reason for the action. In order to avoid summary judgment, the plaintiff must show 'a conflict in substantial evidence' on the question of whether the employer would not have taken the action 'but for' the protected activity." (internal citations omitted)).

The Fifth Circuit has "affirmatively reject[ed] the notion that temporal proximity standing alone can be sufficient proof of but for causation." *Strong*, 482 F.3d at 808; *Aryain* 534 F.3d at 487 ("[T]emporal proximity standing alone is insufficient to establish an issue of fact as to pretext after an employer has provided a non-retaliatory reason."). The July 18, 2017 discipline and the August 11, 2017 termination came 2-3 months after Youngblood's complaints of discrimination. This timing alone fails to raise a fact issue regarding the but-for causation needed to survive summary judgment on the retaliation claim.

However, in addition to the timing between the discrimination complaint and the adverse actions, the record contains some evidence that Noble either reacted with hostility or was dismissive of Youngblood each time he raised the issue of discrimination. After Youngblood contacted Noble's human resources department on May 16, 2017 to inquire about his eligibility for ADPO and DPO positions, Amanda Joiner sent a brief response saying Noble would keep Youngblood in mind for future positions and thanking him for his commitment to Noble. Dkt. 27-4 at 5. On May 17, 2017, Youngblood, spurred by the

29

news that he would not be getting an available position on *Globetrotter* II, sent a follow-up email to Joiner detailing what he felt was discriminatory treatment. *Id.* On May 19, 2017, Youngblood and Joiner talked on the phone. Joiner documented the call in an email to herself, stating she told Youngblood:  that the December 28, 2016 discipline "would not on its own exclude him from being considered for future openings;" that "he needed to stay focused on his current role . . . and not worry about what other employees were doing;" and that "he could still be considered in future if [a permanent position were to arise." Dkt. 27-4 at 8.

Youngblood contends that Joiner's May 19, 2017 email to herself is "a self-serving e-mail with a false recounting of the conversation." Dkt. 30 at 14. Youngblood testified that on the phone Joiner wanted to make sure he did not have anyone else in the room with him because she did not want anyone else to hear what he had to say. Dkt. 31-1 at 225-29. He also testified that she said:  he was simply a "fill-in" and could not go anywhere else; he should be happy they retained his employment; and Noble would not consider him for a permanent position. *Id.* She also refused to send him a summary of their conversation. *Id.*

On the same day as his phone call with Joiner, Youngblood complained to McDorr about discrimination. McDorr's affidavit states he gave Youngblood a verbal warning stating Youngblood acted unprofessionally by interrupting him during a telephone conference. Dkt. 27-6 at 2. However, the record of verbal consultation McDorr prepared at the time does not mention the phone call. It says instead that the reprimand followed a series of letters and conference requests by Youngblood complaining about past disciplinary actions and his temporary employment status. *Id.* at 3. Although the record of

verbal consultation notes that Youngblood acted unprofessionally, it does not say he was given a verbal consultation about acting professionally, but "was given consultation to refocus on his immediate assigned duties and not to focus on re-assignment to another Rig." *Id.*

A week later, on May 26, 2017, Youngblood talked to Captain Malone about his complaints. Malone documented that conversation in an email to Joiner stating that Youngblood complained that he was being discriminated against based on the December 2016 buoy incident, that he had not gotten a firm answer about how long he would remain in his temporary position, that he should have been given a position on the *Globetrotter* II, and that HR would not provide him a record of his contacts with them. Dkt. 27-7 at 20.

Also on May 26, 2017, Youngblood called the Noble employee hotline. The "Case Snapshot" documenting Youngblood's complaint indicates that he complained that the December 28, 2016 write-up was discriminatory.   The electronic case notes also summarize his report that, in response to his complaints, Joiner told him he could not have a permanent position, he should be glad the company retained him in a temporary position, and that she refused to give him a summary of their conversation. Dkt. 27-1 at 4-5. Notes in the "Follow-ups" section show that an HR representative contacted Youngblood on May 27, 2017 to request more information, and again on August 9, 2017 to inquire if he'd hired a lawyer. *Id.* The document does not reflect any other activity in the investigation.

There is also some evidence to support Youngblood's theory that the performance problems noted on the July 18, 2017 written discipline presented to him by Malone on August 11, 2017 were the result of lack of training. The July 18, 2017 discipline was based

on information provided by Chief Mates Arriens and Thibodeaux. Dkt. 27-8; Dkt. 27-6 at 4-5; Dkt. 27-7 at 12-13. In his July 9, 2017 performance review, Thibodeaux commented that "[Youngblood] has been filling in onboard in a temporary position that he has never performed before. It will take time to learn all the responsibilities required in this new role and [he] will continue to progress with help and direction." Earlier, on May 26, 2017, Malone told Joiner that Youngblood "has done a decent job as Third Mate onboard the Taylor. There has been a learning curve with him as he is doing work he absolutely had never been exposed to before, through no fault of his own. He fills in on the DP desk for meal reliefs and seems comfortable with Kongsberg system." Dkt. 27-7 at 20.

Despite recognition by Malone and Thibodeaux that Youngblood needed more training in order to meet expectations, Noble gave him the July 18, 2017 employee discipline form for poor performance and required him to acknowledge or sign it as a condition for accepting a permanent position. Amanda Joiner, who allegedly had told Youngblood that he would not be considered for a permanent position after he complained to her about discrimination, consulted with Captains McDorr and Malone on preparing and editing the July 18, 2017 employee discipline form that Malone presented to Youngblood on August 11, 2017. Dkt. 31-10 at 3-6. The July 18 discipline led to Youngblood's separation of employment with Noble, which he contends was a termination and Noble contends was a resignation.

All of these circumstances combined are sufficient to raise a fact issue regarding pretext and preclude summary judgment on Youngblood's retaliation claim.

## IV.    <u>CONCLUSION AND RECOMMENDATION</u>

For the reasons discussed above, the court **RECOMMENDS** that Noble's Motion for Summary Judgment be **GRANTED in full** as to Youngblood's discrimination claim and **DENIED** as to Youngblood's retaliation claim based on the July 18, 2017 employee discipline form and his August 11, 2017 termination.

The Clerk of the Court shall send copies of the memorandum and recommendation to the respective parties, who will then have fourteen days to file written objections, pursuant to 28 U.S.C. § 636(b)(1)(c). Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc), superseded by statute on other grounds.

Signed on May 15, 2019, at Houston, Texas.

Christina A. Bryan
United States Magistrate Judge